1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   EMANUEL SANCHEZ-GONZALES,              )   Case No.: 1:15-cv-01325-LJO-SAB (PC)
                                            )
12                  Plaintiff,              )
                                            )   FINDINGS AND RECOMMENDATION
13          v.                              )   RECOMMENDING DISMISSAL OF ACTION,
                                            )   WITH PREJUDICE, FOR FAILURE TO STATE A
14   MATTHEW CATE, et al.,                  )   COGNIZABLE CLAIM FOR RELIEF
                                            )
15                  Defendants.             )   [ECF No. 16]
                                            )
16   _____       )

17          Plaintiff Emanuel Sanchez-Gonzales is appearing pro se in this civil rights action pursuant to

18   42 U.S.C. § 1983.  Plaintiff declined United States Magistrate Judge jurisdiction; therefore, this matter

19   was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

20   302.[1]

21          Plaintiff filed the instant action on August 31, 2015.  On October 6, 2015, the first amended

22   complaint was stricken from the record for lack of signature by Plaintiff.  (ECF No. 7.)  Plaintiff filed

23   a first amended complaint on October 26, 2015.  On May 4, 2016, the Court dismissed the first

24   amended complaint, with leave to amend, for failure to state a cognizable claim for relief.  (ECF No.

25   11.)  Plaintiff filed a second amended complaint on July 11, 2016, which like the original complaint

26

27   _____

28   [1] Plaintiff declined magistrate judge jurisdiction on September 14, 2015.  (ECF No. 4.)

                                                    1

was stricken from the record for lack of signature.  (ECF Nos. 14, 15.)  Plaintiff re-filed his second amended complaint on July 22, 2016, which is presently before the Court for screening.

## I.

## SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that "fail[] to state a claim on which relief may be granted," or that "seek[] monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ."  Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Moreover, Plaintiff must demonstrate that each defendant personally participated in the deprivation of Plaintiff's rights.  Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

Prisoners proceeding pro se in civil rights actions are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor.  Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012) (citations omitted).  To survive screening, Plaintiff's claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged.  Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).  The "sheer possibility that a defendant has acted unlawfully" is not sufficient, and "facts that are 'merely consistent with' a defendant's liability" falls short of satisfying the plausibility standard.  Iqbal, 556 U.S. at 678; Moss, 572 F.3d at 969.

## II.

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

Plaintiff is incarcerated at Avenal State Prison.  Plaintiff names Matthew Cate, Susan Hubbard, Deborah Hysen, Felix Igbinoza, Scott Kernan, J. Clark Kelso, Chris Meyer, Tanya Rothchild, Robert

Sillen, Teresa Schwartz, James Tilton, Dwight Winslow, James A. Yates, Arnold Schwarzenegger, and unknown Defendants 1-100, as Defendants.  Plaintiff contends that he has contracted valley fever due to the Defendants' actions, and he was subjected to cruel and unusual punishment.

<u>Defendant Matthew Cate</u>

Defendant Matthew Cate was the Secretary of the California Department of Corrections and Rehabilitation ("CDCR") from 2008 to 2012.  As Secretary, Mr. Cate was responsible for the policies and practices of the organization as well as for its operational decisions, and had direct authority over every CDCR employee.

On information and belief, as of 2007, Mr. Cate knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including Hispanics, as well as immune-comprised or immune-suppressed persons such as those taking medication.

The sources of his knowledge include the January 2007 California Department of Health Services memorandum, widely circulated for "the record," which recommended exclusion of Hispanics, as well as immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed him to personally respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidiomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; and numerous lawsuits against Mr. Cate personally from 2007 onward in which inmates described themselves as high risk identified the basis of that risk.

///

///

3

<u>Defendant Susan L. Hubbard</u>

Defendant Dr. Susan L. Hubbard is the former director of the Division of Adult Institutions ("DAI"), having served in that capacity at least through 2007-2009.  As the former director of DAI, Dr. Hubbard was responsible for the policies and practices of the organization as well as for its operational decisions, and had authority over all employees in this division.

On information and belief, by 2007, Hubbard knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including Hispanics, as well as immune-comprised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases: and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

The sources of her knowledge include: the January 2007, California Department of Health Services memorandum, widely circulated, which recommended exclusion of Hispanics, as well as immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property.

<u>Defendant Deborah Hysen</u>

Deborah Hysen is the current Director of CDCR's Office of Facility Planning, Construction and Management ("FPCM").  Hysen was the Chief Deputy of FPCM from at least 2006 until 2014.

Hysen, first as the Deputy Chief and then as the senior executive of Facilities and Construction for CDCR, had the ability to act no later than 2007 to implement the recommended remedial measures at PVSP, ASP, or any of the hyperendemic prisons but did not do so until 2013, when minimal soil-stabilization was finally attempted.

On information and belief, by 2007, Hysen knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including Hispanics, as well as

4

immune-comprised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases: and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

The sources of his knowledge include the January 2007 California Department of Health Services memorandum, widely circulated for "the record," which recommended exclusion of Hispanics, as well as immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed him to personally respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidiomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum she personally authored, which discussed the various CDHS recommendations from the January 2007 memorandum.

Defendant Igbinoza

On information and belief, Defendant Igbinoza personally instructed his medical staff at Pleasant Valley State Prison ("PVSP") not to provide certain preventative and palliative treatments to inmates even though the denial medical treatment was medically necessary.

Defendant Igbinoza was charged by Defendant Winslow on or about January 16, 2007, with "ensuring health care staff [at PVSP] are trained in and comply with DCHCS [Division of Correctional Health Care Services] policy for identifying, confirming, and reporting symptomatic or disseminated Coccidioidomycosis and be provided the reporting forms." Winslow further stated that the training was "mandatory," and required that the training "must be conducted by Thursday,

February 16, 2007." On information and belief, Defendant Igbinoza failed to adequately train PVSP staff in a timely fashion as directed.

The sources of Dr. Igbinoza's knowledge about high risk inmates include the substance of the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the January, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a September 9, 2007 news article in the Sacramento Bee, which reflected his statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; and over a dozen lawsuits against Dr. Igbinoza personally from 2007 forward in which inmates described themselves as high risk and which entitled them to special consideration on risk basis.

Despite the multiple sources of information, Dr. Igbinoza, as head medical officer at PVSP, refused to exercise his independent authority as chief medical officer to transfer them to their safety.

<u>Defendant J. Clark Kelso</u>

Defendant J. Clark Kelso serves as the Receiver of the California Correctional Health Care Services (CCHCS). Kelso became receiver in early, 2007.

Plaintiff seeks declaratory relief judgment as to whether Kelso had legal authority to intervene in the Valley Fever crisis, as the grant of the Receiver's authority in 2005 was to rehabilitate the

6

1  State's medical care system and may not have extended to a duty to keep the prisons safe from health
2  threats.
3      <u>Defendant Scott Kernan</u>
4      In 2007, Defendant Scott Kernan was the Chief Deputy Secretary of Adult Institutions, its
5  head, for CDCR.  Before becoming Chief Deputy Secretary, Kernan was Deputy Director and Acting
6  Director of DAI.
7      DAI is tasked with the operation of California's prisons and Kernan has been a policy level
8  decision maker for many years.
9      On information and belief, by 2007, Kernan knew of: (1) the prevalence of Valley Fever in the
10  locations of the hyper-endemic prisons and the serious risks from the disease; (2) the elevated risk of
11  infection faced by inmates in various ethnic and racial groups, including Hispanics, as well as
12  immune-comprised or immune-suppressed persons such as those taking medication for chronic
13  arthritis and other diseases: and (3) the need for remedial measures to address and reduce the risk of
14  Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling
15  excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during
16  windy conditions, and providing respiratory protection for inmates who worked outdoors or went out
17  under adverse conditions.
18      The sources of his knowledge include: the January, 2007, California Department of Health
19  Services memorandum, widely circulated, which recommended exclusion of Hispanics, as well as
20  immune-compromised or immune-suppressed persons, and also recommended ground cover
21  throughout the prison property; and a January, 2007 memorandum written by former warden James
22  Yates which considered whether to relocate the high risk groups mentioned in the CDHS'
23  memorandum and implement the CDHS recommendation for ground cover.
24      Mr. Kernan was aware of the Valley Fever problem in general by his receipt of the November,
25  2007 policy, among other documents and was aware that certain groups were at higher risk of
26  suffering more serious complications from it.
27  ///
28  ///

7

Defendant Chris Meyer

Defendant Chris Meyer was the Senior Chief of Facility Planning, Construction and Management from 2009 to 2014.  In that capacity, Meyer had the authority, the ability and the means to have implemented remedial measures to reduce the risk of infection and could have required construction activities at the prisons to be carried out so as to minimize the risks of Valley Fever exposure.  Meyer knew that fully implemented environmental mitigation measures could have reduced the risk.

On information and belief, by 2007, Kernan knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including Hispanics, as well as immune-comprised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases: and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

The sources of his knowledge include: the January, 2007 California Department of Health Services memorandum, widely circulated for "the record," which recommended exclusion of Hispanics, as well as immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions

8

to minimize further harm; and the November 11, 2007 policy memorandum she personally authored, which discusses the various CDHS recommendations from the January 2007 memorandum.

Meyers had the ability to implement measures yet failed to do so and failed to adequately supervise Hysen who was also responsible for implementing measures.

<u>Defendant Tanya Rothchild</u>

Defendant Tanya Rothchild is the former Chief of CDCR's Classification Services Unit ("CSU") from approximately 2008-2012.

Rothchild was aware of the epidemic of Valley Fever because, on information and belief, she received the August 3, 2006 and November 20, 2007, memorandums directed to all classification and parole representatives, which discussed the problem and set the exclusion policies.

On information and belief, as of the beginning of her tenure at CSU, she knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including Hispanics, as well as immune-comprised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases: and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Ms. Rothchild's position and responsibilities as the head transfer agent, and the policy memoranda that governed the job at the time she took office, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have had this knowledge.

She created and continued policies that authorized the transfer of high-risk and other inmates to hyperendemic prisons, without regard to those inmates' susceptibility to infection.  She further failed to adequately supervise subordinates who were responsible for individual classification and transfer decisions that exposed Plaintiff to the risk of infection by virtue of transfer to hyperendemic prisons.

///

<u>Defendant Teresa Schwartz</u>

Defendant Teresa Schwartz is the former Associate Director of the Department of Adult Institutions at CDCR and held this position as of January, 2007 when the recommendations and policy decisions about the Valley Fever epidemic were being made.  Before then, she was a warden at Vacaville in 2004 and an Associate Director of Reception at CDCR from 2005-2006.

As an Associate Director of the Department of Adult Institutions, she was given the ability, and charged with the responsibility, to protect inmates from the unacceptable health risks that they faced.  However, she did not act to intervene in this life threatening emergency, because, based on all of the above circumstances reflecting her knowledge of the problem, and her lack of action, to assure inmate safety, she was deliberately indifferent to the health and safety of inmates at PVSP, and all hyperendemic prisons.

<u>Defendant Arnold Schwarzenegger</u>

Defendant Arnold Schwarzenegger is the former Governor of California, having acted in that position from 2003 through 2011.

As Governor, Mr. Schwarzenegger was ultimately responsible for the policies and practices of the State of California, and had direct authority over every state employee.

On information and belief, as of the beginning of her tenure at CSU, she knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including Hispanics, as well as immune-comprised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases: and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Governor Schwarzenegger's position and responsibilities at the time of his knowledge, being the state's top leader and person with access to the most information and complete power to advance any safety measure, it is implausible that he would not have had this knowledge.

10

1    The sources of his knowledge include, on information and belief, the substantive contents of

2   the following documents: informational briefing from a 2005 prisoners' rights group, Prison

3   Movement, sent directly to Governor Schwarzenegger that he would have received, describing the

4   threat posed by Valley Fever, and especially its threat to susceptible groups including Hispanics,

5   elderly inmates and immune-compromised; the January, 2007 California Department of Health

6   Services memorandum, widely circulated, which recommended exclusion of such high-risk groups

7   and also recommended ground cover throughout the prison property; a January, 2007 memorandum

8   written by former warden James Yates which considered whether to relocate the high risk groups

9   mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover;

10  a 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced

11  "high risk inmates," and which directed prison officials to respond to a recommendation to look for

12  ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for

13  Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested

14  the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions

15  to minimize further harm; and the November 11, 2007 policy memorandum authored by Susan

16  Hubbard, which discussed the various CDHS recommendations about exclusion and remediation.

17       Defendant Robert Sillen

18       Defendant Robert Sillen served as the former Receiver of the California Correctional Health

19  Care Services (CCHCS) from April 17, 2006 through January 23, 2008, when he was replaced by

20  current receiver, Clark Kelso.

21       Plaintiff seeks declaratory relief judgment as to whether Sillen had legal authority to intervene

22  in the Valley Fever crisis, as the grant of the Receiver's authority in 2005 was to rehabilitate the

23  State's medical care system and may not have extended to a duty to keep the prisons safe from health

24  threats.

25       Defendant James Tilton

26       Defendant James Tilton was the Secretary of the CDCR from approximately 2003 to early,

27  2008, when he was succeeded by Matthew Cate.

28

As Secretary, Mr. Tilton was responsible for the policies and practices of the organization as well as for its operational decision, and had direct authority over every CDCR employee.

On information and belief, as of the beginning of her tenure at CSU, she knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including Hispanics, as well as immune-comprised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases: and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

The sources of his knowledge about the Valley Fever problem include the 2004 Kanan memorandum, which identified high-risk groups, such as African-Americans, American Indians, and Asians; the August 3, 2006 Valley Fever policy; the August 24, 2006 memorandum from John Dovey discussing inmate removal due to Valley Fever; a widely circulated email on September 14, 2006 authored by Teri McDonald; the October 27, 2006 memo regarding the number of inmates adversely affected by Valley Fever in  the state prison written by Karen Durst; an August 24, 2006 memo regarding the ordered movement of certain susceptible inmates out of hyperendemic area; an undated (around 2007) memo by Dr. Demetri Papaagianis entitled "Coccidioidomycosis in California Correctional State Institutions,"; a January 10, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in CDHS' memorandum and implement the CDHS recommendation for ground cover; a January 16, 2007 memorandum concerning Valley Fever identification and reporting authored by Dr. Winslow; the January 11, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a May 21, 2007 memorandum written by Dr. Winslow addressing the Valley Fever problem; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California" report, which

1   suggested the diversion and relocation of high risk inmates and contained a myriad of environmental

2   suggestions to minimize further harm; a July 20, 2007 memo written by Deborah Hysen discussing

3   environmental mitigation and the costs and requirements associated with that program; an August 8,

4   2013 Valley Fever mitigation plan; a September 9, 2007 news article in the Sacramento Bee, which

5   reflected Igbinoza's statement that experts had made it clear that it was not safe to engage in additional

6   construction.

7       Defendant Dwight Winslow

8       Defendant Dwight Winslow was the former Statewide Medical Director for CDCR.

9       Dr. Winslow knew, since the 2004 Kanan Memo was circulated to a number of specific health

10  care professionals inside the prison system and was intended to be circulated to all health care

11  managers within the Department of Corrections, that certain inmates were considered high risk.  On

12  information and belief, and as reflected in his responsibilities as the former Statewide Medical

13  Director, Defendant Winslow knew of and was familiar with the contents of that memo on or about the

14  time it was first circulated, by virtue of his receipt of the memorandum at or near the time of its 2004

15  circulation.

16      Dr. Winslow was aware of the Valley Fever problem no later than 2004 and failed to adopt

17  exclusion criteria in his November 2007 policy.

18      Defendant James A. Yates

19      Defendant James A. Yates is the former warden of Pleasant Valley State Prison and is believed

20  to have occupied that position from at least 2005 until 2011.

21      Yates was aware of the epidemic of Valley Fever occurring at his prison throughout this time,

22  or at least since August 2006, because he was copied on and received at the time an August 3, 2006

23  memorandum directed at all wardens which discussed the problem and which set the original

24  exclusion policy.

25  ///

26  ///

27  ///

28

13

# III.

# DISCUSSION

### A.   Linkage Requirement Under Section 1983

Section 1983 provides a cause of action for the violation of Plaintiff's constitutional or other federal rights by persons acting under color of state law.  Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th Cir 2009); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  Crowley v. Nevada ex rel. Nevada Sec'y of State, 678 F.3d 730, 734 (9th Cir. 2012) (citing Graham v. Connor, 490 U.S. 386, 393-94 (1989)) (internal quotation marks omitted).  To state a claim, Plaintiff must allege facts demonstrating the existence of a link, or causal connection, between each defendant's actions or omissions and a violation of his federal rights.  Lemire v. California Dep't of Corr. and Rehab., 726 F.3d 1062, 1074-75 (9th Cir. 2013); Starr v. Baca, 652 F.3d 1202, 1205-08 (9th Cir. 2011).

Supervisory personnel may not be held liable under section 1983 for the actions of subordinate employees based on *respondeat superior*, or vicarious liability.  Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013); accord Lemire v. California Dep't of Corr. and Rehab., 726 F.3d 1062, 1074-75 (9th Cir. 2013); Lacey v. Maricopa County, 693 F.3d 896, 915-16 (9th Cir. 2012) (en banc).  "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  Crowley, 734 F.3d at 977 (citing Snow, 681 F.3d at 989) (internal quotation marks omitted); accord Lemire, 726 F.3d at 1074-75; Lacey, 693 F.3d at 915-16.  "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation."  Crowley, 734 F.3d at 977 (citing Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)) (internal quotation marks omitted).

All Defendants named in Plaintiff's second amended complaint are in supervisory positions.  Thus, no Defendant had any personal interactions with Plaintiff to form a basis of liability.  In order to

form a basis for liability, Plaintiff must demonstrate that Defendants "participated in or directed the violations, or knew of the violations and failed to act to prevent them."  With regard to a policy and/or custom, Plaintiff must demonstrate that the policy or custom was the moving force behind the violation.  Furthermore, Plaintiff must demonstrate more than mere conclusory, speculative allegations.  Plaintiff must set forth sufficient facts from which the requisite liability may be based.

Plaintiff's allegation of knowledge rests solely on the existence of studies and/or reports dating back to 2004, without any linkage whatsoever to Plaintiff's circumstances.  The documentation relates mainly to conditions at PVSP, not ASP.  Plaintiff's reliance on publications or events that are related to Valley Fever, without any specific factual allegations to link them to an individual Defendant, is not sufficient to infer knowledge to that Defendant.  Plaintiff's allegations that Defendants "personally acted" to deprive him of his constitutional rights, is nothing more than a unsupported, conclusory allegation.  Even under the liberal standards applied to civil rights pro se actions, the Court may not supply essential elements of a claim which are not pled.  Chapman v. Pier One Imports (U.S.), Inc., 631 F.3d 939, 955 (9th Cir. 2011).  Thus, Plaintiff's conclusory allegations are not entitled to the presumption of truth, Iqbal, 556 U.S. at 681, and are insufficient to give rise to a plausible claim for relief.   Plaintiff was given an opportunity correct these deficiencies, but he has failed to do so.  Furthermore, for the reasons explained below, Plaintiff's claims also fail to state a cognizable constitutional claim for relief under the Eighth Amendment.

### B.      Eighth Amendment

The Eighth Amendment protects against cruel and unusual punishment.  U.S. Const. amend. VIII.  To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  A prisoner's claim does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,' " and (2) "the prison official 'acted with deliberate indifference in doing so.' "  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)).

1    Under the Eighth Amendment, "prion officials are…prohibited from being deliberately

2 indifferent to policies and practices that expose inmates to a substantial risk of serious harm." Parsons

3 v. Ryan, 754 F.3d 657, 677 (9th Cir. 2014); see also Hellings v. McKinney, 509 U.S. 25, 35 (1993);

4 Farmer v. Brennan, 511 U.S. 825, 847 (1994) (prison official violates Eighth Amendment if he or she

5 knows of a substantial risk of serious harm to an inmate and fails to take reasonable measures to avoid

6 the harm).

7    "Deliberate indifference occurs when '[an] official acted or failed to act despite his knowledge

8 of a substantial risk of serious harm.'" Solis v. Cnty. of Los Angeles, 514 F.3d 946, 957 (9th Cir.

9 2008).  A prisoner may state "a cause of action under the Eighth Amendment by alleging that [prison

10 officials] have, with deliberate indifference, exposed him to [environmental conditions] that pose an

11 unreasonable risk of serious damage to his future health." Helling v. McKinney, 509 U.S. 25, 35

12 (1993).

13    "The second step, showing 'deliberate indifference,' involves a two part inquiry." Thomas v.

14 Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  "First, the inmate must show that the prison officials

15 were aware of a 'substantial risk of serious harm' to an inmate's health or safety." Id. (quoting

16 Farmer, 511 U.S. at 837).  "This part of [the] inquiry may be satisfied if the inmate shows that the risk

17 posed by the deprivation was obvious." Id. (citation omitted).  "Second, the inmate must show that the

18 prison officials had no 'reasonable' justification for the deprivation, in spite of that risk." Id. (citing

19 Farmer, 511 U.S. at 844) "("[P]rison officials who actually knew of a substantial risk to inmate health

20 or safety may be found free from liability if they responded reasonably.") (footnote omitted).

21    As explained above, Plaintiff has failed to sufficiently allege that any Defendant knew of a risk

22 of harm and failed to prevent it.  Although Plaintiff cites to numerous documents and reports and

23 contends such documents were available, or known, such allegation is insufficient to demonstrate

24 personal knowledge and participation in the alleged constitutional violation.  In addition, any claim by

25 Plaintiff that Defendants may have had access to his central files does not demonstrate that they knew

26 of a risk to Plaintiff and failed to act.  There are simply insufficient facts to connect the actions of any

27 of the Defendants to the alleged constitutional to support a finding of knowledge of a risk to Plaintiff.

28

In order to proceed with a claim under section 1983, Plaintiff must allege sufficient factual allegations to plausibly demonstrate that Defendants exhibited deliberate indifference in taking, or failing to take, the alleged actions.  See Lua v. Smith, 1:14-cv-00019-LJO-MJS (PC), 2015 WL 1565370, at *4 (E.D. Cal. 2015).  The Court acknowledges that the precise contours of what is required to state a claim under the Eighth Amendment based on exposure to Valley Fever are not clearly determined, it is established that mere exposure to, and contraction of, Valley Fever while housed at an endemic institution are not, by themselves, sufficient to state a constitutional claim under the Eighth Amendment.  Plaintiff's second amended complaint is a verbatim copy of certain pages of the prior original (96 pages) and first amended complaint (103 pages), which the Court previously found deficient.  Thus, it is clear to the Court that Plaintiff is unable to cure the deficiencies identified by the Court and further leave to amend is futile.

For the foregoing reasons, Plaintiff's allegations are speculative, at best, and fail to demonstrate a constitutional violation against any Defendant.  Plaintiff was previously provided an opportunity to correct the deficiencies, but he has failed to do so.  Akhtar v. Mesa, 698 F.3d, 1202, 1212-1213 (9th Cir. 2012); Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000); Noll v. Carlson, 809 F.2d 1446, 1448-1449 (9th Cir. 1987).  Accordingly, further leave to amend is not warranted.

## IV.

## RECOMMENDATION

For the reasons stated, Plaintiff fails to state a cognizable claim for relief against any Defendant.  The Court provided Plaintiff with an opportunity to correct the deficiencies, but rather than provide additional facts, Plaintiff simply submitted selected portions of his prior complaints.  Further leave to amend is not warranted.  Akhtar v. Mesa, 698 F.3d at 1212-1213; Lopez v. Smith, 203 F.3d at 1130; Noll v. Carlson, 809 F.2d at 1448-1449.

Accordingly, it is HEREBY RECOMMENDED that this action be dismissed, without further leave to amend, for failure to state a cognizable claim for relief.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with this Findings and Recommendation, the parties may file written objections with the

Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **November 28, 2016**

UNITED STATES MAGISTRATE JUDGE